[No. 1793.]

Catherine Sheppard v. The State.

1. Infanticide — Indictment. — It is the settled rule of law in this State that it is sufficient to allege that the murder, or other like offense, was committed in some way or manner, and by some means, instruments and weapons to the grand jurors unknown. See the opinion *in extenso* for an indictment *held* sufficient to charge the offense of infanticide.

2. Same — Fact Case. — See statement of the case for evidence *held* insufficient to support a conviction for infanticide.

Appeal from the District Court of Falls. Tried below before the Hon. B. W. Rimes.

A conviction of murder in the second degree was the result of the appellant's trial upon an indictment charging her with infanticide. Ten years in the penitentiary was the punishment assessed by the jury.

W. S. Hunnicutt was the first witness for the State. He testified that he had known the defendant for a number of years. On Friday, a week prior to the alleged murder, the defendant was at the house of the witness, and the witness observed then that she was in an advanced state of pregnancy. Her gait in walking was so peculiarly that of a female approaching confinement, that, as she walked away from the witness's house, the witness remarked to some one standing near that he very much doubted whether she would reach home before delivery. The witness was the justice of the peace of precinct number two, Falls county, and as such was called upon, on the 6th day of April, 1884, to hold an inquest over the dead body of a child. The body was that of a large, fat, plump, well developed female negro child. It had a full growth of hair and nails. It had been buried in a wooden box, the top of which was not placed more than an inch under the earth. The box was not in the hole when the witness reached it, and had been turned over. The body had on it a gown or shroud made of domestic which corresponded with a fabric of the same kind afterwards found at the house of the defendant. It was also wrapped in an old black calico dress. The box also contained some cotton and coagulated blood. The private parts of the body were enveloped in a diaper, and it was evident that there had been an evacuation of the bowels.

From the point where the body was found, the witness and his party proceeded to the house of the defendant, some three hundred yards distant. She was not found. The witness, however, found

a piece of domestic which corresponded in color, texture, and the manner in which it was cut, with the piece of which the shroud was made. Witness also found some coagulated blood in a shed room, which was covered with old rags; and some blood on the bed, and on some under female garments that hung up on a wall. No one was at the house except some small children. Witness did not see the defendant until she was brought before him on her examining trial, on the 16th day of April, 1884. She was not, and did not look, pregnant at that time. The defendant was a married woman, but for two years had been separated from her husband.

Three other houses stood within four hundred yards distant from the point where the body was found. These houses were occupied by negroes. There was a negro settlement about a mile distant from the place where the body was found, on the road leading to Kosse. The body of the child was found on a cow trail, in a very secluded place, surrounded by a thicket. Witness knew of no burial place near the point where the body of the child was found. Witness made a careful examination of the body of the child, but found no marks of violence upon it. The witness exhibited the black calico dress found on the body to Captain W. B. Blalock, for identification. This all occurred in Falls county, Texas.

W. B. Blalock testified, for the State, that he had known the defendant for several years. She lived in Harris county during the greater part of the year 1883, but returned to Falls county in the fall of that year to pick cotton. She came to the witness and asked to be stocked for the purpose of making a crop. Witness saw then that she was in an advanced stage of pregnancy, and he refused, advising her to hire out, as she was in no condition to make a crop. She acknowledged her pregnancy and agreed that it was best for her to hire out. Some time during the early part of the year 1884, some one of the witness's family gave the defendant an old, worn and dilapidated black calico dress. On the morning that the body of the child was found, W. S. Hunnicutt exhibited to the witness an old, black calico dress, which the witness took to be the dress given to defendant by some one of his family. When this dress was presented to the witness's wife for identification, she said that it resembled the one given to defendant, except that it was lined in the sleeves with spotted calico, whereas the one given defendant was not so lined. The defendant was a splendid servant, and had always been kind and affectionate to her children. Three families of negroes, in one of which there were no females, lived near the defendant. One of the women of these families gave birth to a child

about a week before the discovery of the dead body, which child is still living. There was a negro grave-yard about three miles distant from the defendant's house.

M. N. Canterbury testified, for the State, that he was constable of precinct number two, Falls county, Texas. On the day after the body of the child was found, Justice Hunnicutt placed in the witness's hands a warrant for the arrest of the defendant. Witness went immediately to her house, and, though he made careful search, failed to find her. Hearing that defendant was seen going in the direction of Horn Hill, in Limestone county, the witness followed, taking Lee Lowe with him to identify the defendant. At a house about four miles north of Horn Hill, witness met a negro man, whom he asked if he had seen anything of a woman answering the description of the defendant. He replied that he had not. Witness then dismounted and went into the house. As he approached the door, witness saw the defendant standing in a side room, in full view of the main entrance. Witness asked her if she was Catherine Sheppard; to which question she made no reply. Witness then called Lowe, and asked him if the woman was Catherine Sheppard. Lowe made some answer that witness did not understand. He again demanded of Lowe if the woman was Catherine Sheppard, and the defendant cried out: "No! no! no!" Witness again demanded of Lowe an answer to his question. Lowe answered that the woman was Catherine Sheppard, whereupon the witness arrested her. On the way back to Falls county, the witness observed the defendant closely. She did not then appear to be pregnant. Witness saw her draw what he took to be a moist cloth from her breast and toss it upon the ground.

Lee Lowe testified, for the State, that he had known the defendant for many years. He saw her during the month of March, 1884, when she had every appearance of pregnancy. Witness was with Constable Canterbury when he arrested the defendant on or about the 10th day of April, 1884. When arrested, the defendant denied that her name was Catherine Sheppard. When arrested, she did not have as much appearance of pregnancy as she had when witness saw her in March. She was arrested about twenty-four miles distant from her Falls county residence.

Frank Mitchell was the next witness for the State. He testified that on the morning of April 4, 1884, he was driving some cattle along a cow trail on Blue Ridge, in Falls county, Texas. One of the cattle in descending the hill ran into a small dry ravine, surrounded by a thicket. The witness followed and noticed the end of a small

wooden box, which was unearthed by the animal stepping on it. Witness dismounted, dragged the box from the hole in which it was buried, and overturned it. The body of a child rolled out. Witness removed the covering from its face, and called his companions to see it. Leaving the body as it lay, the witness and his party went and notified Mr. Ed. Stone. The place where the body was found was not near any grave-yard; was some three or four hundred yards from the defendant's house, and a short distance further from two other negro cabins. Considerable rain had previously fallen, and it was raining slowly at the time that witness discovered the body. The hole in which the box was buried appeared to have been dug out with a hoe. The lid of the box was not fastened.

Anthony Jemison was next introduced by the State, and he testified that he knew the defendant and saw her frequently prior to her arrest. He saw her on the morning that the body of the child was found, and before he heard of that event. She was then sitting in her door, patching a pair of pants. Witness stopped and talked to her a few minutes. She did not appear in the least excited, but talked in her usual manner. Witness heard of the finding of the body of the child a short time after he left the defendant's house. Witness did not know, when he was at the defendant's house on that morning, that she knew of the discovery of the body. Defendant was the mother of four children, whom she supported up to the time of her arrest. The defendant raised one of the witness's children for him. Witness frequently saw the defendant prior to the alleged murder, but if she was pregnant the witness did not notice it.

The next witness was Burrill Jones. He testified that he lived about three hundred yards from the house occupied by the defendant in Falls county. The houses of the witness and defendant were plainly in view. The wife of the witness was confined about two weeks before the arrest of the defendant. The defendant waited on the witness's wife during her confinement, by request of the witness. Witness called her in because she was the nearest female neighbor, and it was raining too hard to go after a doctor. During her presence at witness's house, the witness observed her frequently. She did not then appear to be pregnant. Witness remembered no conversation in which he told any party or parties that the defendant was pregnant when she was at his house attending his wife. Witness did not know whether or not the defendant was a midwife.

Frank Clifton testified that he was with the witness Mitchell when the body was found. He saw Mitchell drag the box from the hole, and turn it over. The corpse was not disturbed further than

to sufficiently expose it to see what it was. The top of the box was covered about an inch deep with earth. The discovery, as soon as made, was reported to Mr. Ed. Stone. A slow rain was falling when the body was found. Witness saw no tracks about the place.

Ed. Stone was next introduced by the State. He testified that on Saturday morning, April 5, 1884, Frank Mitchell and Frank Clifton returned to his house from a cow hunt, and reported the discovery of the body of a dead negro child. Witness returned with them to the place they designated, and found the corpse of an apparently fully developed negro baby. It had a full growth of hair and perfectly formed nails. It was in a small wooden box, wore a gown or shroud, and was wrapped also in an old black calico dress. Witness removed this covering sufficiently to ascertain what it was, and despatched one of the boys to summon Justice Hunnicutt. Witness served on the jury of inquest, and as a juror made an examination. The body, in the opinion of the witness, was that of a child fully developed. The umbilical cord was cut in the usual manner, and was partially tied with a ligature. The hands were tied across the breast with a piece of domestic, which, in texture and appearance, corresponded with the domestic of which the shroud was made.

From the place where the body was found, the justice and the coroner's jury proceeded to the house of the defendant, where they found some domestic which corresponded in every way with that of which the child's shroud was made. They found, also, in a side room under some old rags, some coagulated blood, which resembled the coagulated blood found in the box in which the child was buried. Some bloody female under garments were found hanging against a wall, and some blood splotches were found on the bed in the defendant's house. They found also, in the defendant's yard, some planks which in appearance corresponded with those of which the lid to the burial box was made. Witness made a careful examination of the body, but could discover no traces of violence on it. One of the legs reposed in the box akimbo. Witness could not distinguish any of the usual signs of strangulation. The lid of the box was not fastened down.

Doctor J. C. Shaw testified that he was called upon by Justice Hunnicutt, on the 4th day of April, 1884, to make, in his professional character, a post mortem examination of the body of a dead negro child, which was found about two miles distant from the witness's house. He found the body to be that of an apparently fully developed and full grown negro child. It had a full growth of hair and perfectly

formed nails. One of the legs was akimbo in the box used as a coffin, and the hands were tied across the breast with a piece of domestic similar to that of which its shroud was made. The shrouded body was wrapped in an old, torn and dilapidated black calico dress. The box also contained some cotton and coagulated blood. There was some blood on the old dress. The witness cut open the body and found the heart and lungs in an apparently healthy condition. He found the blood in the chest in the proper channels, which was an indication that the child had breathed. The first breath a child breathes expands the chest, inflates the lungs, and sends the blood coursing through its natural channels. A child often breathes before complete delivery,— that is, it can breathe if the head has been expelled. And it is a fact that the child sometimes breathes while confined in the mother's womb. The witness did not apply the hydrostatic test, the best known to medical science, and could not say positively that the lungs of the child had or had not been inflated with air.

The umbilical cord had been severed in the usual manner, and was partially wrapped with a ligature. It had a very healthy appearance, though the presence of coagulated blood was detected. This, however, might be the case with a still-born child. Children are often born after drawing one or two breaths, and expire from natural causes. The body in this case wore a diaper or napkin, which was soiled by an evacuation of the bowels — a very strong indication that the child was born alive. The skin on the body was perfectly healthy in appearance. Every indication showed that the body had been carefully prepared for burial. The witness described the discoveries made at the house of the defendant exactly as they were described by the witness Stone. Witness heard the testimony of all the witnesses on this trial, and, taking that testimony to be true, in connection with his own knowledge as herein detailed, it was his professional opinion that the deceased child was born alive, and that it had an independent existence, separate and distinct from its mother. The witness made a careful examination of the body, but found no *indicia* of violence. A child, however, may be killed in various ways without leaving a single trace of injury.

Doctor R. O. Nettles, for the defendant, testified that his experience as a physician covered about sixteen years of time. He had listened attentively to so much of the evidence as he had heard on the trial. He heard all of the testimony of Doctor Shaw. Referring to Doctor Shaw's testimony regarding the condition of the umbilical cord, lungs and breast of the deceased child, the wit

ness would say that, in his opinion, such conditions were by no means certain indications that the child was born alive. Even in still-born children, the blood frequently flows from the umbilical cord. The best and strongest indication that the child was born alive, in the opinion of the witness, was that afforded by the evacuation of the bowels, as shown by the condition of the diaper, though that is by no means an infallible test, as it could occur in the case of a still-born child when the stomach is full, and especially if any mechanical pressure is applied to the stomach of the child in moving it about. An evacuation from the bowels of an infant resulting from mechanical pressure would not likely occur at the very time of the application of such pressure. It is not unusual to find that even grown people have had discharges from the bowels after death. From the evidence heard by the witness, and from that stated to him, the witness could not say that the child in this instance was born alive and had an independent existence separate and distinct from its mother. It is possible for a child to be still-born, with healthy looking skin, full growth of hair and perfect nails. The hydrostatic is the best test known to medical science, to determine whether or not a child was born alive.

The sufficiency of the evidence to support the verdict was the ground relied upon for new trial.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. Omitting formal averments, we reproduce the charging portion of the indictment, which is as follows: "One Catherine Sheppard . . . with force and arms, in the county and State aforesaid, then and there being an adult female, pregnant and big with a certain child, did then and there give birth to said child, which was then and there wholly born alive and in existence by actual birth, then and there having an independent circulation and existence, separate and apart from her, the said Catherine Sheppard, the mother of the same; and the said Catherine Sheppard, immediately after said child was then and there born alive as aforesaid, in and upon the person of her said child unlawfully, wilfully, feloniously and of her malice aforethought, did then and there make an assault; and that she, the said Catherine Sheppard, in some way and manner and by some means to the grand jurors unknown, did then and there wilfully, feloniously and of her malice aforethought, kill and murder her said child, so that said

child then and there instantly died. And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Catherine Sheppard her said child in the manner and form aforesaid, and by the means aforesaid, wilfully, feloniously and of her malice aforethought did then and there kill and murder," etc.

It will be noticed that the means, instrument, etc., with which the murder was effected are not stated. With regard to this peculiarity "it is well settled that it is sufficient to allege that the murder was committed in some way or manner, and by some means, instruments and weapons, to the jurors unknown." (*Walker* v. *The State*, 14 Texas Ct. App., 609, and authorities there cited.) We are of opinion the indictment sufficiently charges the offense of infanticide upon a child newly born. (*Sallie Wallace* v. *The State*, 7 Texas Ct. App., 570, and same case, 10 Texas Ct. App., 255.)

No objection is urged to the charge of the learned judge to the jury in this case, and it appears to be a clear enunciation of the law applicable to the facts, in accordance with the principles declared in the Sallie Wallace cases, *supra*. There are in the record no bills of exception to the admission or rejection of evidence.

The only question for us to determine is as to the sufficiency of the evidence to sustain the verdict and judgment. Let us concede that it is sufficiently established that appellant gave birth to the child which was found dead in the box which was discovered buried in the ravine. Does the evidence sufficiently show that the child had been born alive and that it was killed after its birth?

Dr. Shaw, who saw the child, says the child was well developed and apparently full grown. He examined it carefully and saw no marks of violence upon its body. He opened the body and its heart and lungs had a healthy appearance. A diaper or napkin was found upon the child, which was stained as though it had had an evacuation, and this, in his opinion, was a strong indication that the child was born alive. He did not apply the hydrostatic test to the lungs,— the best test known to medical science for determining whether or not the lungs have ever been inflated by air. His opinion, from his examination of the body and hearing the testimony of the other witnesses, was that the child had been born alive, and had an independent existence, separate from its mother. In addition to other facts, he stated that the umbilical cord had been tied.

Dr. Nettles, who heard Dr. Shaw's testimony, and having had the testimony of the other witnesses stated to him, said that from this testimony "I could not say that it (the child) had a separate existence from that of its mother. The best test known to medical

science, to determine whether the child breathed or not after birth, is the hydrostatic test. A full grown child, with full head of hair and well turned and rounded nails, might come still-born, and its skin might have a healthy appearance."

To say the least of it, the evidence that the child was born alive is susceptible of doubt. But concede this fact. Did its mother murder it? No violence is seen on the body of the child. The most inculpatory facts are that she concealed its birth, that it was found buried in an out of the way ravine, and that she left that section of the country, and perhaps denied her name when the officer went to arrest her. These, doubtless, are suspicious facts, but in the absence of any evidences of violence upon the dead body we do not think they are in themselves sufficient to establish the fact that she murdered her child.

On account of the insufficiency of the evidence to sustain the verdict and judgment, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered October 25, 1884.]